THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GEORGE FORELLI and ALVIN KLEINFELDT, Respondents.

Second Department, June 13, 1977

*Nicholas Ferraro, District Attorney (Barry A. Schwartz* of counsel; *David Beekman* on the brief), for appellant.

*Irving Anolik* for respondents.

SHAPIRO, J. The People appeal from an order of the Supreme Court, Queens County, dated September 20, 1976, which, after a hearing, suppressed the use of a gun and a cartridge as evidence against the defendants.[1]

The indictment charges the defendants with the crime of criminal possession of a weapon in the third degree, a class D felony.

After a hearing on the defendants' motion to suppress the gun and cartridge as evidence, the court made findings of fact and conclusions of law. We accept the court's factual findings, but reject its conclusion of law that, based upon its findings, suppression had to follow.

Based upon the testimony of the only witness at the hearing, the arresting officer, Dacko, the court made the following findings: At approximately 4 A.M. on November 7, 1975, Officer Dacko was operating a police car on radio motor patrol westbound on Jamaica Avenue, near 78th Street, when he heard a shot. He stopped the car and rolled down the window.

---

1. The notice of appeal was accompanied by the statement required by CPL 450.50 that, in the opinion of the District Attorney, the deprivation of the use of the evidence ordered suppressed has rendered the sum of the proof available to the People with respect to the crime charged in the indictment so weak in its entirety that any reasonable possibility of prosecuting such charge to a conviction has been effectively destroyed.

Three minutes later he heard another shot. Several seconds later he saw the defendants' vehicle proceeding eastbound on Jamaica Avenue, three short blocks away, coming from the direction of the shots. There were no other vehicles or pedestrians in sight. He did not attempt to block the vehicle. Instead he allowed it to pass. He then made a U-turn behind the car, started his red lights flashing and his partner, with the use of the hand-mike and loudspeaker, ordered the car to pull over to the curb. As he was bringing his own car to a stop some 12 feet behind the defendants' car, he "stepped on his brights and observed an object, which he identified as a gun, being dropped to the ground from the passenger side of defendants' vehicle." He was then still in his police car.

After the gun struck the ground, Officer Dacko and his partner "exited their patrol car with their guns drawn" and ordered the defendants to get out of their car "with their hands in the air." After "his partner had recovered the weapon from the ground, Officer Dacko searched the vehicle" and, "[o]n the front seat, he found a cartridge which was of the same calibre as the recovered weapon." He then formally placed them under arrest and his partner gave them their rights. The defendant Forelli was identified as the driver and the defendant Kleinfeldt as the passenger.

Upon the foregoing findings of fact, the hearing court concluded, as a matter of law, the "[t]he connection between the two shots and the sighting of a vehicle approaching at 25 miles per hour from the direction of the sound of those shots, is tenuous at best", that "[w]hile there is a founded suspicion that criminal activity was present, there is nothing to link the defendants with that activity" and that "[e]ven accepting the shots as exigent circumstances, there is still no link between them and these defendants." The hearing court then determined that, as a matter of law: "The use of their dome and loudspeaker by the officers was an [sic] restraint which was unjustified by the facts in the case at bar. (People v De Bour [40 NY2d 210], supra; People v Cantor, 36 NY2d 106.)" The court concluded that, by reason thereof: "There being no basis for the stop and no probable cause to arrest the defendants, the search of their vehicle was unlawful."

We are in utter disagreement with that conclusion and do not believe that the De Bour and Cantor cases stand for the aforesaid propositions. Having heard two separate and distinct gun shots fired from the direction from which the defendants

were coming in their vehicle, and there having been no other vehicles or pedestrians in sight anywhere in the vicinity, the officers would have been derelict in their duty if they had not investigated the occurrence. In concluding that the defendants had been illegally stopped although there was "a founded suspicion * * * [of] criminal activity" afoot because of the firing of the shots, the court entirely mistook the reason for the stop. It predicated its finding of illegality upon the ground that there had been no link between the defendants and the shots. However, assuming, as we must, the duty of the police to immediately investigate the source of the gun shots which they heard (see *Terry v Ohio,* 392 US 1, 23), there was nothing unreasonable about their conduct in seeking to inquire of the defendants what, if anything, they knew about it. If the defendants had been pedestrians it certainly would not be contended that, in the exercise of their common-law right to inquire, the police could not stop them and ask if they had heard the shots or knew anything about where they had come from (cf. *People v Cantor, supra).* Here the defendants were in a moving vehicle and the only method available to the police to accomplish the same purpose — to make inquiry — was to stop the automobile and question its occupants since "the police can and should find out about unusual situations they see, as well as suspicious ones" *(People v Rosemond,* 26 NY2d 101, 104).

*People v De Bour,* 40 NY2d 210, 213 *(supra),* which the hearing court cited to support its conclusion that the stop was illegal, is a direct authority to the contrary, for the court there said: "This case raises the fundamental issue of whether or not a police officer, in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information. We hold that he may. The basis for this inquiry need not rest on any indication of criminal activity on the part of the person of whom the inquiry is made but there must be some articulable reason sufficient to justify the police action which was undertaken."

How much greater justification is there for a police officer to "approach a private citizen on the street for the purpose of requesting information" when the basis for the inquiry *does* rest on an indication that there was criminal activity afoot, even if it was not "on the part of the person of whom the inquiry is made."

In *De Bour* the court also said (pp 215-218):

"As noted in *Cantor* whether or not a particular search or seizure is to be considered reasonable requires a weighing of the government's interest against the encroachment involved with respect to an individual's right to privacy and personal security (at p 111). Thus, we must consider first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible.

"Considering the justification at its inception, we first address the People's interpretation of the *Cantor* opinion. Their argument that the patrolmen were authorized to ascertain whether there was any criminal activity is a sheer bootstrap. *Before the police may stop a person pursuant to the common-law right to inquire there must exist at that moment a founded suspicion that criminal activity is present (People v Cantor, supra; People v Rosemond,* 26 NY2d 101). The police may not justify a stop by a subsequently acquired suspicion resulting from the stop. This reasoning is the same which refuses to validate a search by what it produces (e.g., *People v Scott D.,* 34 NY2d 483, 490). *To validate this stop under the common-law power to inquire, we must examine the knowledge possessed at that moment and any reasonable inferences.* Although this analysis involves a less stringent degree of belief than probable cause, it should be approached in the same manner so as to permit the use of familiar signposts as points of reference. * * *

"We turn now to the appellant's interpretation of *Cantor (supra).* Contrary to the appellant's assertions, *Cantor should not be read as a blanket prohibition of all police-citizen encounters conducted in the absence of probable cause or reasonable suspicion based on concrete observations.* To be sure, police officers may not seize an individual, either physically or constructively, without some articulable justification *(People v Cantor,* 36 NY2d 106, 111, *supra; Terry v Ohio,* 392 US 1). However, not every encounter constitutes a seizure.

"We have defined a seizure of the person for constitutional purposes to be a significant interruption with an individual's liberty of movement *(People v Cantor,* 36 NY2d 106, 111, *supra).* Our recent decisions have emphasized the primacy of the right to be. free from aggressive governmental interference. In *Cantor (supra)* the actions of three plainclothes officers in surrounding the defendant with revolvers drawn

and blocking his vehicle with their own was considered an unconstitutional seizure. Similarly, in *People v Ingle* (36 NY2d 413, 418) where a motorist was 'accosted' and 'restrained' for a 'routine traffic check' we held that this constituted a 'limited seizure within the meaning of constitutional limitations' (see, also, *People v Martinez,* 37 NY2d 662, *supra,* and *People v Allende,* 39 NY2d 474, *supra).* The conduct of the policemen in the instant case presents a sharp contrast to these last-mentioned cases. Here De Bour was merely approached and questioned by two uniformed officers whose conduct bespoke no violent or forcible apprehension. Clearly then, De Bour was not seized in the sense that Cantor and Ingle were.

"Despite the lack of a forcible seizure here all constitutional considerations do not disappear. The basic purpose of the constitutional protections against unlawful searches and seizures is to safeguard the privacy and security of each and every person against all arbitrary intrusions by government. Therefore, any time an intrusion on the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity, the spirit of the Constitution has been violated and the aggrieved party may invoke the exclusionary rule or appropriate forms of civil redress. It is in this vein that the defendant urges that his right as a citizen to walk the streets unimpeded by the State has been trammelled.

"*While we agree that the patrolmen here had no articulable reason to seize forcibly, or arrest the defendant, we cannot say that the defendant's right to be free from an official interference by way of inquiry is absolute.* Were we to carry the defendant's interpretations of *Cantor* and the Constitution to their logical extreme we would have to conclude that when the police possess a need or desire to initiate an encounter with a private individual they must be prepared to seize him or else do nothing. This approach is hardly reasonable and if adopted would probably lead to an overcompensation in the form of a dilution of the standards embracing reasonable suspicion or probable cause. 'The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would "leave law-abiding citizens at the mercy of the officers' whim or caprice" ' (*Wong Sun v United States,* 371 US 471, 479; *Henry v United States,* 361 US 98). *Common sense and a firm grasp of the practicalities involved compel us to reject an*

*all or nothing approach. The crucial factor is whether or not the police behavior can be characterized as reasonable which, in terms of accepted standards, requires a balancing of the interests involved in the police inquiry (People v Ingle, 36 NY2d 413, 419, supra; Terry v Ohio, 392 US 1, 20-21, supra; Camara v Municipal Ct., 387 US 523, 536-537; People v Cantor, 36 NY2d 106, supra; People v Kuhn, 33 NY2d 203, 209)."* (Emphasis supplied.)

In an endeavor to show that the police, in alighting from their vehicle with guns drawn, had thereby improperly and without probable cause placed the defendants under arrest, the defendants, in their brief, assert "they [the police] did not know what that object [which was thrown by one of the defendants from their car] was until it was retrieved." If that were a factually correct statement of what the record shows, and what the trial court found, their conclusion would be correct. In fact, however, the record makes it clear, and the trial court found as a fact, that the officers observed that what was thrown from the passenger's side of the defendants' vehicle was an object which, when it landed on the ground, was observed to be a gun and it was only thereafter that, as the court said, the "officers then exited their patrol car with their guns drawn."

In *People v Cantor* (36 NY2d 106, 114, *supra)*, which was also cited by the hearing court as one of the bases for its conclusion, the gun was suppressed because it was "revealed as a direct consequence of the illegal nature of the stop." Here, on the contrary, as we have shown, there was nothing illegal about the stop. It was a proper stop for the purpose of making a proper inquiry (see *People v Archiopoli,* 39 AD2d 748).

As the court said in *People v La Pene* (40 NY2d 210, 223), which was decided jointly with *People v De Bour:* "In the instant case the information possessed by the police along with the attendant circumstances including any exigencies must be evaluated in order to assess the legality of the police action." By that test the purpose of the stop here was legal and proper and did not constitute an arrest. The arrest of the defendants only took place when the police officers exited their automobile with their guns drawn and, at that time, they had reasonable and probable cause for so doing because they had seen a gun thrown from the automobile occupied by the defendants.

Accordingly the order of suppression should be reversed and the defendants' motion denied.[2]

MARTUSCELLO, J. P., LATHAM and O'CONNOR, JJ., concur.

Order of the Supreme Court, Queens County, dated September 20, 1976, reversed, on the law, and motion to suppress physical evidence denied. The findings of fact are affirmed.

2. Out of a superabundance of caution I point out that this case should not be confused with the principle articulated in *People v Green* (57 AD2d 183), in which, in speaking for a majority of the court, I concluded that the defendant's arrest lacked probable cause, and that therefore the gun in that case had to be suppressed. The salient point of difference between the two cases is that in *Green* there was a physical seizure of the defendant's person without any articulable reason therefor.